2005 OK 39

**In the Matter of the REINSTATEMENT OF Douglas Jerome "Jerry" FRALEY, to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.**

No. SCBD 4834.

Supreme Court of Oklahoma.

May 25, 2005.

Rehearing Denied June 29, 2005.

Gary Rife, Oklahoma City, for applicant.

Dan Murdock, General Counsel, Nathan Lockhart, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for respondent.

EDMONDSON, J.

¶ 1 In this application for reinstatement to membership in the Oklahoma Bar Association the issues to be decided are: (1) Is the record [1] sufficient for our meaningful *de novo* consideration of the application? and (2) Did applicant establish the prerequisites and meet his burden of proof of showing by clear and convincing evidence that his reinstatement is justified? We answer both questions in the negative.

¶ 2 This is an unusual and complicated reinstatement matter because applicant, Jerry Fraley's, resignation did not comply with requirements of the governing rules. On December 18, 1997, Mr. Fraley sent a letter

---

1. The record consists of a transcript of the hearing before the Trial Panel, several exhibits which were admitted into evidence at the hearing and the Trial Panel's report.

to the Executive Director of the Oklahoma Bar Association which stated in full: "Effective immediately, I hereby resign as a member of the Bar of the State of Oklahoma." The following day, December 19, 1997, the Executive Director responded with a letter acknowledging receipt of Mr. Fraley's letter and advising him that his resignation from membership "has been accepted."

¶ 3 Mr. Fraley gave no reason for his resignation in the letter. The undisclosed reason behind his decision to resign was that his employer, Mr. Bill Cathcart, had just discovered that Mr. Fraley had misappropriated funds belonging to the firm and to its clients to cover his gambling losses.

I.

¶ 4 Mr. Fraley filed his petition for reinstatement on September 5, 2003, pursuant to Rule 11.1 of the Rules Governing Disciplinary Proceedings, (RGDP) 5 O.S.2001, Ch. 1, App. 1–A. This is his first attempt at reinstatement. At the August 2004 hearing on his petition before the three-member trial panel of the Professional Responsibility Tribunal (PRT), Mr. Fraley testified and his wife, his therapist and three lawyers testified in his behalf. Mr. Cathcart submitted an affidavit. The Bar Association presented no evidence against him and no witnesses of its own.

¶ 5 Mr. Fraley testified that he was admitted to the practice of law in 1984 and went to work for the Cathcart firm in Oklahoma City in 1986. He related that he developed a gradual interest in wagering on horse races at Remington Park in Oklahoma City and that at first he was quite successful. For a considerable period preceding the 1997 discovery of his misappropriation of funds, he had been spending more and more time at the track gambling and drinking heavily. He began losing money regularly and started spending money from savings and other sources of his own trying to recover on his losses, but he failed to turn his luck around. When he ran out of his own money, he began taking money from the firm.

¶ 6 He testified about the discovery of his misappropriation of funds and related that on

or about December 15, 1997, Mr. Cathcart had called a meeting and confronted him about money missing from a specific file, the Kunkel file, which was a fire subrogation case. Mr. Fraley stated that he admitted to Mr. Cathcart that he had taken the money in question which was the firm's attorney fee. His testimony did not reveal the amount of that money, however. At that meeting he had also admitted that there were other files from which he had taken money and he had cooperated with Mr. Cathcart in reviewing them. He stated there were three primary files involved, and he identified the two in addition to the Kunkel file as the First Christian Church of Poteau and the Phillips cases, also fire subrogation matters. In the First Christian Church case he said he had taken about $6,000.00, which was comprised of $2,000.00 of the firm's money and $4,000.00 of the client's money. He did not remember the amount he had taken from the Phillips file, but he knew that some client money was involved in that case also. He stated that Mr. Cathcart had written a memo setting out the facts of all the involved cases and he had no reason to disagree with Mr. Cathcart's recollection of the amounts. He testified that together they determined the amount he owed was $25,000.00, and he thought that amount was about right.

¶ 7 Mr. Cathcart had arranged for a lawyer, Mr. Gary Rife, to represent Mr. Fraley in their discussions. Mr. Fraley stated that he, Mr. Rife, and Mr. Cathcart had determined their primary goal was to avoid any client loss to the firm because of what he had done, and together they worked out an agreement to reach that goal. Under its terms, the firm would immediately reimburse the clients' funds, Mr. Fraley would make full restitution of all money involved, Mr. Fraley would resign from the Bar and give up his license to practice law and Mr. Cathcart would keep Mr. Fraley employed as a law clerk at the firm subject to some conditions, including that Mr. Fraley stop gambling. Just as agreed, those actions all took place.

¶ 8 Mr. Fraley testified that even though no one had yet complained to the Bar, the three of them made the decision that the

"best way" to proceed was for him "just to resign." He stated that he understood on his own and from talking with Mr. Rife that the effect of his resignation under the circumstances would be "the same as" resigning pending disciplinary action or being disbarred, and that he would not be practicing law for at least five years. As required by RGDP 9.1,[2] Mr. Fraley did immediately notify his clients of his resignation and withdrew from all cases in which he was involved, and he testified that he had not practiced law since his resignation.

¶ 9 For about two and a half years following his resignation he worked for Mr. Cathcart as a legal assistant, but Mr. Cathcart fired him in July 2000. While Mr. Fraley did not specify the reasons for that termination, his testimony suggested that unsatisfactory job performance played some role in that decision. From July 2000 until the summer of 2002, Mr. Fraley did some substitute teaching and delivered newspapers. He also began working part time for several law firms doing research and file reviews. One of those jobs had developed into a full-time position in August 2002, and Mr. Fraley was employed there at the time of the 2004 hearing. He offered evidence that he had kept current and maintained competence in the law.

¶ 10 Mr. Fraley stated he had always had a negative attitude about the value of counseling; however, shortly after his resignation he received a citation for DUI and as a result he was required to attend group counseling sessions and Alcoholics Anonymous meetings. Following that he went to some other counseling sessions but did not stick with it. He explained that in January 2003 he had begun attending regular counseling sessions with a licensed counselor, was currently having regular weekly sessions which he found very beneficial, and that he intended to continue with counseling in the future.

¶ 11 Mr. Fraley's wife testified that after his resignation he was depressed and frustrated, also that they had significant financial problems which caused them to twice sell their homes and buy smaller houses. She thought counseling had helped him and she believed he was no longer drinking or gambling. Three lawyers testified on Mr. Fraley's behalf, speaking positively about his good character, intelligence, legal knowledge and research skills. They stated that he had not engaged in the unauthorized practice of law since his resignation. Their knowledge of his misconduct had come from discussions with Mr. Fraley.

¶ 12 Mr. Cathcart attested by affidavit that Mr. Fraley had been with his firm for fourteen (14) years when he discovered Mr. Fraley had diverted funds from the firm and clients for his personal use; Mr. Fraley had assisted him in reviewing all the involved files; he had reimbursed the clients and Mr. Fraley had reimbursed him for those funds. Aside from the diversion of funds, Mr. Cathcart believed Mr. Fraley to have been an excellent attorney and fine person during his employment. Mr. Cathcart stated he would not oppose Mr. Fraley's reinstatement if those close to Mr. Fraley—his wife, current employer and counselor—are able to verify that he no longer has problems with "gambling and related issues."

¶ 13 Mr. Fraley's counselor testified that depression might have been an underlying factor which led to Mr. Fraley's problems with gambling, alcohol abuse and ultimately to professional misconduct. She related that he has shown significant improvement since beginning therapy and she believes he has learned enough about himself that he can handle problems now much better than before. She did not believe he was now suffering from depression or still gambling or drinking excessively.

¶ 14 The Oklahoma Bar Association supported Mr. Fraley's application and did not present any witnesses against him. After consideration of the evidence presented in support of his petition, the three-member

2. RGDP 9.1 provides: "When the action of the Supreme Court becomes final, a lawyer who is disbarred or suspended, or who has resigned membership pending disciplinary proceedings, must notify all of the lawyer's clients having legal business then pending within twenty (20) days.... Proof of substantial compliance by the lawyer ... shall be a condition precedent to any petition for reinstatement."

trial panel of the Professional Responsibility Tribunal unanimously concluded that Mr. Fraley had carried his burden of proof and deserved to be reinstated. The Bar Association joined with him in his brief before us and urges us to grant his petition for reinstatement.

## II.

¶ 15 The authorized procedures for a member's resignation from the Bar Association are set forth in the rules of the Bar Association: Section 3 of the Rules Creating and Controlling the Oklahoma Bar Association (RCCOBA), 5 O.S.1991, Ch. 1, App. 1, Art. II, and Rules 8.1 and 8.2 of the Rules Governing Disciplinary Proceedings, (RGDP)5 O.S.1991, Ch. 1, App. 1–A, which are set forth here. The current versions of these sections are the same in all substantial respects.

Section 3 RCCOBA provides:

(a) Any member may resign his membership in the Association by filing with the Executive Director a written resignation, whereupon he shall automatically cease to be a member and shall not thereafter be entitled to the privileges and advantages of membership in the Association. The Executive Director shall publicize the fact of resignation and shall cause a record thereof to be made in the records of the Association and of the Clerk of the Supreme Court.

(b) ... Any member who resigns shall remain subject to the Supreme Court's disciplinary jurisdiction and procedures for any misconduct committed while a member of the Oklahoma Bar Association. If, at the time of resignation, disciplinary proceedings or investigations which result in disciplinary proceedings are pending against the resigning member, the files and records thereof together with evidence later obtained, shall be impounded by the Board of Governors and shall be considered in connection with any subsequent application for reinstatement or with subsequent disciplinary action against him.

A member who resigns pending disciplinary proceedings or pending investigation which might result in disciplinary proceedings must do so upon a form prescribed by the General Counsel, approved by the Chief Justice, so drawn as to elicit acknowledgment that the resignation is submitted pending disciplinary proceedings or investigation of charges, specifying particularly the misconduct alleged; that the resignation is voluntary and with knowledge of its consequences; that the member agrees that he may be reinstated only upon full compliance with the condition and procedure prescribed by these rules; and that no application for reinstatement may be filed prior to the lapse of five (5) years from the date of resignation.

¶ 16 The terms of RGDP 8.1 set forth the following prerequisites for resignation pending disciplinary proceedings:

A lawyer who is the subject of an investigation into, or a pending proceeding involving, allegations of misconduct may resign membership in the Oklahoma Bar Association, and thereby relinquish the right to practice law, only by delivering to the [Professional Responsibility] Commission an affidavit stating that the lawyer desires to resign and that:

(a) The resignation is freely and voluntarily rendered, the lawyer is not being subjected to coercion or duress, and the lawyer is fully aware of the consequences of submitting the resignation;

(b) The lawyer is aware that there is presently pending an investigation into, or proceedings involving, allegations that there exist grounds for discipline, specifying particularly the misconduct alleged;

(c) The lawyer agrees that he may be reinstated only upon full compliance with the conditions and procedures prescribed by these Rules, and no application for reinstatement may be filed prior to the lapse of five years from the effective date of the resignation.

RGDP 8.2 provides:

Upon receipt of the required affidavit, the Commission shall file it with the Clerk of the Supreme Court and the Supreme Court may enter an order approving the resignation pending disciplinary proceed-

ings. A lawyer who so resigns shall only be permitted to apply for reinstatement after the lapse of five (5) years and under the provisions of RGDP 11.

¶ 17 In light of his professional misconduct, Mr. Fraley's letter to the Executive Director of the Bar Association simply announcing his immediate resignation does not meet the requirements of RCCOBA Section 3(b), which are mirrored in RGDP 8.1 and 8.2, the provisions controlling resignations pending disciplinary proceedings. Accordingly we ordered Mr. Fraley and the Bar Association to submit supplemental briefs addressing the failures of his resignation and its acceptance by respondent to comply with Section 3(b) and RGDP 8.1 and 8.2 and the effect, if any, which those failures may have on his application for reinstatement.

¶ 18 Both Mr. Fraley and the Bar Association contended his failure to resign in compliance with the rules should have no effect on his application for reinstatement. Mr. Fraley argued the rules were not applicable to his situation because when he resigned on December 18, 1997, there was neither an "investigation into charges, nor allegation of misconduct, nor a pending proceeding involving allegations of misconduct" and that one or the other of those actions was "essential to trigger" the requirements of Section 3(b) and RGDP 8.1 and 8.2.

¶ 19 Mr. Fraley points out that he resigned after seeking the advice of counsel as to how to avoid any client loss to his firm and that he understood the effect of his resignation was the same as if he had resigned pending disciplinary proceedings. In resigning as he did, he states he had sought no personal advantage and has conducted himself as though he had in fact resigned pending disciplinary proceeding as set out by the rules; he notified his clients of his resignation, and he had waited over five years to apply for reinstatement. He acknowledges that the purpose of Rules 8.1 and 8.2 is to create a record before this Court of previously confidential matters and he asserts that even though the Rules did not apply to him, that purpose was satisfied because he disclosed his misconduct to the trial panel.

¶ 20 The Oklahoma Bar Association explained that the Office of the General Counsel, in the exercise of its prosecutorial discretion, had decided not to pursue any formal investigation or disciplinary proceedings against Mr. Fraley because it learned of Mr. Fraley's misconduct after his resignation had been accepted on December 19, 1997,[3] and also because there had been no loss to the client security fund. The Bar contended that even though it neither invoked the provisions of the rules, nor commenced an investigation or disciplinary proceeding, nor filed the resignation with this Court for our approval, Mr. Fraley did meet the requirements for readmission under the rules and that if he had attempted to seek reinstatement before the conclusion of the five year period following his resignation, the General Counsel would have used evidence of his conversion of funds against him in opposing his reinstatement. The Bar also argues that Mr. Fraley disclosed his misconduct to the PRT and the parties agreed that he should be held to the standard for reinstatement of a person who had been previously disciplined,[4] so that in

**3.** In proof of this point, the Bar submitted the following letter from Bill Cathcart to Dan Murdock, General Counsel, as an attachment to its brief. The letter, dated December 30, 1997, and received by the General Counsel's office on December 31, 1997, states in full:

"Dear Dan:

This will confirm our telephone conversation of December 26, 1997. Prior to Jerry's resignation from the Oklahoma Bar Association, we discovered incidents where funds had been diverted for his personal use. With Jerry's cooperation and assistance, we have reviewed those files which involved client funds and have now reimbursed those clients.

We are in the process of conducting an audit of Jerry's files to confirm that there have been no other incidents of misappropriation of funds. At the conclusion of that audit, I will provide you with the facts and circumstances of the violations of the Rules of Professional Responsibility. In the meantime, please give me a call if you have any questions regarding the matter."

**4.** The transcript reveals that counsel for the Bar misstated the posture of this matter in his opening statement to the PRT as follows: "... [b]asically there are two types of reinstatements. The first reinstatement is [one in] which no previous discipline has been imposed by the Supreme Court. It's basically if you resign voluntarily or you didn't pay your dues or you didn't complete your CLE for the year and you get stricken and you have to come back through the reinstatement

this instance any failure of the applicant or the Bar to comply with the procedural rules governing resignation and discipline should not have any effect on the reinstatement effort.

 ¶ 21 There is no room for doubt that an attorney who resigns by reason of professional misconduct is required to comply with the rules. Members of the Bar are licensees who are subject to regulations pertaining to their license to practice law, and the rules governing resignation from the Bar are enforced against them to preclude resignation by means which do not meet the requirements of the rules. *State ex rel. Oklahoma Bar Association v. Gasaway*, 1993 OK 133, 863 P.2d 1189, 1193–1194; *State ex rel. Oklahoma Bar Association v. Kessler*, 1995 OK 32, 895 P.2d, 713, 716–718.

¶ 22 We have refused to accept proffered resignations which did not meet the requirements of Rules 8.1 and 8.2 and, instead, ordered the attorneys disbarred. *State ex rel. Oklahoma Bar Association v. Perkins*, 1988 OK 65, 757 P.2d 825, 828 (resignations with future effective dates refused as not within RGDP 8.1); *State ex rel. Oklahoma Bar Association v. Kessler*, 895 P.2d, 713, 716–718(explaining that under RGDP 8.2 Court may accept or reject resignation which complies with rules, resignation refused because of respondent's uncooperative behavior). In *State ex rel. Oklahoma Bar Association v. Gasaway*, 1993 OK 133, 863 P.2d 1189, we rejected the lawyer's resignation pending disciplinary proceedings submitted for our approval because it did not set forth the nature of other grievances. We additionally observed that the rules governing resignation are designed to create the complete record this Court will need in disciplinary and subsequent reinstatement proceedings, and stated:

"When a lawyer resigns from the Bar under a cloud of allegations of professional misconduct this Court requires the lawyer to set forth with particularity the allegations against the lawyer and any

pending Bar investigations. This requirement results in the creation of a formal record in this Court that includes all pending disciplinary matters and investigations.... Thus, the resignation not only memorializes the public matters in the formal complaint but also brings previously confidential matters before the Court and the public." *Id.* at 1194–1195.

¶ 23 This requirement, we stressed, serves "important interests for the benefit of the resigning lawyer, the Bar Association and the public" as the "purposes of accepting a resignation during discipline do *not* include keeping allegations of unprofessional conduct from the Court or secreting the allegations from the public eye." *Id.* at 1195.

¶ 24 The arrangement employed by the parties for Mr. Fraley's resignation is outside the intention of the rules and we do not agree with the suggestion that the effect is "the same as" having resigned in compliance with the rules. There is no factor in this case which would excuse Mr. Fraley's noncompliance with the requirements for resignation set forth in Section 3(b) which are mirrored in RGDP 8.1 and 8.2.

### III.

 ¶ 25 It goes without saying that Mr. Fraley's admitted actions are a profound breach of professional ethics as well as an offense against the common honesty expected of all trustworthy people of good character and warranted the severe discipline of disbarment. Misappropriation is the most serious of money-related professional misconduct. RGDP 1.4(c) provides that "Theft by conversion or otherwise of the funds of a client shall, if proven, result in disbarment." See *State ex rel. Oklahoma Bar Association v. Mayes*, 2003 OK 23, 66 P.3d 398, 405; *State ex rel. Oklahoma Bar Association v. Gray*, 1997 OK 140, 948 P.2d 1221.

¶ 26 To our knowledge this decision by the Office of the General Counsel to abstain from investigating and prosecuting a member of

process. There's a second type of reinstatement and I believe this—it's what we have in this case, is where there has been some discipline previous. There's been a formal investigation done by the

Bar and either you were disbarred or suspended for two-years-and-a day or something along that line."

the Bar who has committed an act of such serious misconduct is unprecedented. The reasoning offered by the Bar as justification for the exercise of its discretion in favor of inaction is most unpersuasive.

¶ 27 The Bar's responsibility and duty to investigate a member's misappropriation of client and firm funds to his own use are not affected by whether a loss is suffered by the client security fund, or the member's resignation. Attorneys may not shield themselves from the reach of the rules of professional responsibility and this Court's discipline by voluntarily changing their status. RCCOBA Section 3(b); RGDP 1.3.[5] See *State ex rel. Oklahoma Bar Association v. Caldwell,* 1994 OK 57, 880 P.2d 349 (Court rejected argument raised by Bar and respondent lawyer that her voluntary change of membership status from "active" to "associate" protected her from misconduct charged in a then pending complaint as she was no longer able to practice law).

¶ 28 Also unpersuasive is Mr. Fraley's argument that he was not required to comply with the rules when he resigned on December 18, 1997, as there was "neither an investigation into charges or allegations of misconduct nor a pending proceeding involving allegations of misconduct." Mr. Fraley was resigning because he had in fact misappropriated client and firm funds to his own use and gotten caught by his employer. Three days later he submitted his non-compliant resignation, in which he intentionally withheld the truth about what he had done. If the Bar had been unaware of his misconduct when it received his resignation, nothing on the face of it would have called for the independent investigation which the misconduct warranted. A lawyer guilty of misconduct should not be able to avoid the rules governing resignation and thus place himself beyond the enforcement responsibilities of the Bar and the disciplinary power of this Court.

¶ 29 We believe Mr. Fraley and the Bar have been less than fully candid with this Court about the events surrounding his resignation and its acceptance. The arrangements for Mr. Fraley's resignation had been worked out in advance by Mr. Fraley, Mr. Rife, and Mr. Cathcart, which gives rise to the very strong inference that the Bar had agreed to accept his resignation under Section 3(a) and Mr. Fraley knew it would be accepted as submitted. It is this prior knowledge that explains why he submitted a resignation that is patently non-compliant in light of the underlying circumstances of professional misconduct, and why he neither made any effort to comply with Section 3(b) nor began working with the Bar in anticipation of the commencement of a disciplinary proceeding under RGDP 8. We believe Mr. Fraley knew the Bar would not investigate his misconduct or commence a disciplinary proceeding against him and he therefore felt secure that the rules were not applicable to him and would not be deemed to be applicable to him in the future.

¶ 30 The arrangements for Mr. Fraley's resignation explain also why the Bar did not revoke its acceptance of his resignation when it learned a week later, purportedly for the first time, about his professional misconduct. Surely, if the Bar had actually believed on December 18 that Mr. Fraley was resigning under Section 3(a) for a benign reason such as changing careers or moving out of state, it would have reacted swiftly and purposefully to revoke its December 19 acceptance when it learned—in the December 26 telephone conversation referred to in Mr. Cathcart's letter—that the real motivation behind Mr. Fraley's resignation was his misappropriation of client and firm funds.

¶ 31 We are also of the opinion that Mr. Fraley does not truly believe he sought no personal advantage by the way in which he resigned. His testimony expressly revealed that his priority was protecting the firm from losing clients because of his actions. It seems likely he sought to further that goal by circumventing this Court's involvement in his resignation process in order to keep his

5. RGDP 1.3 provides: "The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline."

misappropriation from becoming public knowledge. It is also reasonable to infer he hoped to avoid the possibility this Court would refuse his resignation and impel less agreeable discipline.

¶ 32 It is more mystifying that the Bar declined to investigate and prosecute an attorney who admits he misappropriated money from clients and his firm, preferring to delegate its responsibilities to the attorney's employer. We recognize, however, that this Court cannot command the Bar to investigate the wrongdoing of a practitioner and to file and prosecute a disciplinary action before us—even in the face of what may appear to us to be flagrant circumstances.

IV.

¶ 33 The constitution places in the judiciary the responsibility for legislation, prosecution and adjudication in the arena of professional discipline of lawyers. *Tweedy v. State ex rel. Oklahoma Bar Association*, 1981 OK 12, 624 P.2d 1049, 1054; *In re Integration of the State Bar of Oklahoma*, 1939 OK 378, 185 Okla. 505, 95 P.2d 113. Our authority over professional discipline is also conferred by statute.[6] We perform the legislative and adjudicative functions directly, but the enforcement or prosecutorial role is placed by our rules with the organs of the Bar in order to meet the demands of constitutional due process. As we cannot constitutionally be both the judge and prosecutor, we may not control directly or indirectly those decisions made in the exercise of prosecutorial judgment as to whether to investigate and commence and prosecute charges. *Tweedy v. State ex rel. Oklahoma Bar Association*, 624 P.2d at 1054–1055; *State ex rel. Oklahoma Bar Association v. Minter*, 2001 OK 69, 37 P.3d 763, 768.

¶ 34 While we cannot control investigation and prosecution decisions of the Bar, we do solely control decisions concerning readmission. Though the Bar indiscreetly accepted this resignation, the applicant's readmission to the practice of law depends entirely on our judgment and the exercise of our discretion. For purposes of his reinstatement proceeding, we consider Mr. Fraley's resignation to be in all respects the same as a RGDP 8.1 resignation pending disciplinary proceeding wherein the burden on an applicant is the same as if he or she had been disbarred. *In the Matter of the Reinstatement of Kamins*, 1988 OK 32, 752 P.2d 1125, 1129; *In the of the Matter of Reinstatement of Page*, 2004 OK 49, 94 P.3d 80, 81–82.

¶ 35 In passing on applications seeking reinstatement our primary duty is to protect the public and safeguard public confidence in the legal profession as a whole and the judiciary which licenses them. There must also be a determination that reinstatement would not adversely affect the Bar. *Matter of Reinstatement of Kamins*, 752 P.2d at 1129; *State ex rel. Oklahoma Bar Association v. Katz*, 1995 OK 115, 907 P.2d 1029. The misappropriation of client and firm funds is not a matter which implicates only private interests as the relationship between a lawyer and his client calls for the highest degree of integrity and fidelity, and nothing less can be tolerated. *State ex rel. Oklahoma Bar Association v. Gray*, 948 P.2d at 1221. Speaking to the importance of that relationship in *State ex rel. Oklahoma Bar Association v. Raskin*, 642 P.2d at 267, we explained that when a lawyer converts a client's funds, the mere circumstance of restitution is likely to be fortuitous and does not afford a reliable test of a person's moral fitness as a lawyer; and while restitution is encouraged in individual cases, it "does not significantly retard the subtle, but progressive, erosion of public confidence in the integrity of the bench and bar." We also set forth the following which is instructive here:

"By withholding discipline when restitution is made, the ethical standards of the profession are not maintained and the confidence of the public is diminished.... To

6. Title 5 O.S.2001, Section 13 provides: "The Supreme Court of Oklahoma shall have the exclusive power and authority to discipline attorneys and counselors at law or revoke the permit to practice law granted to attorneys and counsel-

ors at law and the rules of conduct of attorneys and counselors at law in this state shall be such as are now or may hereafter be prescribed by the statutes of Oklahoma and the rules of the Supreme Court."

the extent that attorney misconduct is treated as a private dispute between the lawyer and his clients, the efforts of the legal profession to preserve its integrity and to protect the general public may be substantially undercut." *Id.* at 268, n. 10.

¶ 36 In reinstatement proceedings, as in other disciplinary matters, this Court does not sit in review of the PRT's recommendations but instead functions as an adjudicative licensing authority. *State ex rel. Oklahoma Bar Association. v. Samara,* 683 P.2d 979, 984. We possess original, exclusive and nondelegable jurisdiction which rests on our constitutionally vested power to control and regulate the practice of law and the licensing, ethics and discipline of attorneys. *Matter of Reinstatement of Kamins,* 1988 OK 32, 752 P.2d 1125, 1129. In our decision-making we must conduct a full-scale, non-deferential, *de novo* examination of all relevant facts and neither stipulation of facts nor the trial panel's findings or recommendations are binding on our determination, but are merely advisory. *State ex rel. Oklahoma Bar Association v. Caldwell,* 880 P.2d at 354; *State ex rel. Oklahoma Bar Association v. Minter,* 2001 OK 69, 37 P.3d 763, 768–769.

¶ 37 The applicant in a reinstatement proceeding bears a heavy burden to show his reinstatement is warranted. The more serious the offense, the heavier the burden. The provisions controlling a former member's reinstatement to the Bar are set forth in RGDP Rule 11, 5 O.S.2001, Ch. 1, App. 1–A, and govern the application, the trial panel's investigation and hearing, the requisite standard of proof, the prerequisite findings and report thereon required by the panel and the review of that report by this Court. Rule 11.4 provides:

An applicant for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement will be required to present stronger proof of qualifications than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applicable, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel. . . .

¶ 38 Rule 11.5 provides that in its report to this Court, along with the transcript of the hearing, the trial panel must make specific findings regarding the evidence concerning whether or not the applicant: (1) possesses the good moral character entitling him to be admitted to the Oklahoma Bar Association; (2) has not engaged in any unauthorized practice of law during the period of suspension, disbarment or resignation; and (3) possesses the competency and learning in the law required for admission to practice law in Oklahoma.

¶ 39 We license lawyers for practice of their profession which by its nature places them in a position where a dishonorable person could do tremendous harm. For that reason the burden placed on one seeking reinstatement after he has shown disregard for the integrity and standards of the profession requires that his showing as to each factor must be by clear and convincing evidence, because the maintenance of strict integrity in lawyers is one of our constitutional responsibilities. *State ex rel. Oklahoma Bar Association v. Raskin,* 642 P.2d at 266. The primary purpose of disciplinary proceedings is not punishment of the practitioner but purification of the bar. *State ex rel. Oklahoma Bar Association v. Samara,* 683 P.2d at 983. Our inquiry in a reinstatement proceeding is undertaken with utmost seriousness and concern, because we present every licensed lawyer to the public as a person who is worthy of their confidence in the performance of all professional activities.

¶ 40 In *In the Matter of the Reinstatement of Kamins,* 752 P.2d at 1129–1130, we spoke at length of the utmost seriousness with

which we view our duty of deciding applications for reinstatement to the bar, and that in doing so our primary duty is to safeguard the public, the courts and the legal system. We set forth there the following statement from the Supreme Court of Kansas in *State v. Russo*, 230 Kan. 5, 630 P.2d 711 (1981), which accurately reflected our thoughts on the grave nature of our consideration then, as it does now:

> It is the duty of the Supreme Court to preserve the high ethical and moral standards required before a person is entitled to enjoy the privilege to practice law. When one first petitions for admission to the bar, he must meet the qualifications required of a member of the profession. When a former attorney seeks reinstatement, he must meet an even greater burden than when he was originally admitted and must overcome the prior adverse conclusions of the court as to his fitness to practice law. (Citations omitted.) Although it may be said that Mr. Russo "voluntarily" surrendered his certificate to practice law, the same was only done when it became apparent that disbarment was inevitable and such surrender constitutes a voluntary disbarment. The decision whether reinstatement of an attorney is justified and will be granted rests exclusively within the discretion of the court, (Citations omitted.) and the public interest in maintaining the integrity of the administration of justice is paramount in making such a determination. *Id.* at 714.

¶ 41 In *Kamins* we also discussed and adopted additional factors which courts have traditionally considered concerning reinstatement to the practice of law, including: (1) the applicant's demonstrated consciousness of wrongful conduct and the disrepute which that conduct brought to the profession; (2) the extent of an applicant's rehabilitation; (3) the seriousness of the original misconduct; (4) the applicant's conduct after the resignation; (5) the time which has elapsed since the resignation; (6) the applicant's character, maturity and experience at the time of discipline or resignation. *Id.* at 1130.

## V.

¶ 42 In *State ex rel. Oklahoma Bar Association v. Samara*, 683 P.2d at 983–984, we explained that reinstatement proceedings serve the purpose of providing a forum for assuring the State and the Bar that attorneys licensed by this Court will meet the solemn standards of integrity, competence and respect for the law which the public deserves. We also recognized that because an attorney's duties to this Court and to society in general are broad and practitioners are required to exercise unfailing devotion to the legal profession, the rules specifically require that this Court must have a wide basis for our inquiry in order to assess an applicant's fitness for readmission. *Samara* at 983. Our case law makes it clear that this Court must be free to make broad inquiries for our full scale exploration of all factors which are relevant to our consideration of whether to readmit an applicant to the Bar, and we must have the entire record of an attorney's professional conduct before us. *Samara* at 983. See also *State ex rel. Oklahoma Bar Association v. Caldwell*, 880 P.2d at 355; *State ex rel. Oklahoma Bar Association.v. Warzyn*, 1981 OK 23, 624 P.2d 1068, 1071.

¶ 43 It is our duty to conduct a *de novo* review of the evidence presented to the Professional Responsibility Tribunal regarding all factors pertinent under the rules and to determine whether the applicant has carried his or her burden of showing clearly and convincingly that he or she is worthy of being an attorney of the State of Oklahoma. We cannot discharge our duty of review unless the Professional Responsibility Tribunal submits a complete record of the proceeding for our *de novo* examination which is sufficient to permit our independent determination of all essential facts. *State ex rel. Oklahoma Bar Association v. Samara*, 683 P.2d at 983–984, *State ex rel. Oklahoma Bar Association v. Caldwell*, 880 P.2d at 355.

¶ 44 Our first responsibility then, in reinstatement matters as in other disciplinary proceedings, is to ensure that the record before us is sufficient for our thorough inquiry into all relevant facts pertaining to the applicant, the original misconduct and the

likelihood of applicant's rehabilitation. *Samara* at 983. We have explained that because a complete record is essential in our review of a bar disciplinary matter, the material within our scope of review is never to be deemed beyond our authority to expand it, and the record always remains within our plenary power to expand by an order calling for its supplementation. *State ex rel. Oklahoma Bar Association v. Samara,* 683 P.2d at 983–984; *State ex rel. Oklahoma Bar Association v. Heinen,* 2002 OK 81, 60 P.3d 1018; *State ex rel. Oklahoma Bar Association v. Caldwell,* 880 P.2d at 355, n. 20; *State ex rel. Oklahoma Bar Association v. Lacoste,* 1991 OK 51, 813 P.2d 501, 504–507 (Simms, J. and Opala, C.J., dissenting).

## CONCLUSION

¶ 45 The record presented to us for Mr. Fraley's readmission attempt is insufficient and inadequate for our *de novo* consideration of his application. As a result of the unprecedented procedure the parties followed, we have been kept in the dark about what happened here and about Mr. Fraley himself. There is no evidence before us regarding his prior professional misconduct, if any, or of the particulars of the original offenses and the surrounding circumstances expressly required by RGDP 11.4. Because the paucity of this record directly results from Mr. Fraley's intentional withholding of germane information regarding his resignation from the Bar, this Court feels no compulsion to exercise our plenary power to remand this matter to the Professional Responsibility Tribunal for the purpose of supplementing the record by conducting further hearing on his application. Mr. Fraley's evidence did not establish the prerequisites set forth in the rules on reinstatement and he did not meet his burden of proof of showing by clear and convincing evidence that his reinstatement is justified. Accordingly, his application is denied.

¶ 46 WATT, C.J., KAUGER, EDMONDSON, TAYLOR, COLBERT, JJ.-Concur.

¶ 47 LAVENDER, HARGRAVE, JJ.-Concur in result.

¶ 48 OPALA, J.-Concurs in part, dissents in part.

¶ 49 WINCHESTER, V.C.J.-Dissents.

OPALA, J., dissenting in part.

¶ 1 The court *denies* petitioner's quest for Bar relicensure *without* affording him an opportunity to complete a diminuted record [1] by adding to its contents proof of circumstances that surround his earlier resignation and its acceptance by the Bar. Of legitimate interest here is the role, if any, petitioner played in a scenario that kept the resignation from being channeled for this court's approval. While I share the court's interest in petitioner's participation, if any he had, in an agreement for irregular disposition of his resignation, I would not seal his professional coffin by closing today the door to any chance of re-pressing *in this very cause* his relicensure efforts aided by a supplemented record. He certainly should have a chance to clear himself of *voluntary complicity* which casts a cloud upon his prior resignation. That opportunity for exculpation should be extended to petitioner as part of the process that is his constitutional due.

¶ 2 I would hence declare, as the court does today, that the record is insufficient for consideration of petitioner's reinstatement quest; instead of denying the petition, I would retransfer the cause to the PRT with directions that, if petitioner so requests, the panel should proceed further to conduct a full-scale inquiry into petitioner's participation, if any, in circumnavigating this court's approval of his earlier resignation.

WINCHESTER, V.C.J., Dissenting:

¶ 1 There is no question that the actions of the applicant, Douglas Jerome Fraley, were a breach of professional ethics and warranted the severest form of discipline. But, the applicant is entirely correct when he answers

---

1. A diminuted record is one that incompletely reflects the proceedings *sub judice.* BLACK'S LAW DICTIONARY, 7th ed. (1999).

this Court that there were no pending disciplinary proceedings, nor an investigation at the time of his resignation. The rules cited by the majority require pending disciplinary proceedings or an investigation. Rule 8.1 of the Rules Governing Disciplinary Proceedings, 5 O.S.2001, ch. 1, app. 1–A, begins: "A lawyer who is the subject of an investigation into, or a pending proceeding involving, allegations of misconduct. . . ." If a lawyer is the subject of an investigation by the Bar Association or has a disciplinary proceeding pending, he may resign by following subsections (a) through (c).

¶ 2 Failure to follow Rule 8.1 may result in the Court's refusal to accept the resignation. *State ex rel. Oklahoma Bar Ass'n v. Kessler,* 1995 OK 32, ¶ 16, 895 P.2d 713, 717. *See also State ex rel. Oklahoma Bar Ass'n v. Gasaway,* 1993 OK 133, 863 P.2d 1189, and *State ex rel. Oklahoma Bar Ass'n v. Perkins,* 1988 OK 65, 757 P.2d 825. In *Kessler, Gasaway, and Perkins,* disciplinary proceedings were pending. The majority opinion does not cite any authority that requires a lawyer to report himself for a violation of a rule, nor follow Rule 8.1 when he is not even under investigation by the Bar Association. Rule 8.3(a) of the Rules of Professional Conduct, 5 O.S.2001, ch. 1, app. 3–A, provides that a lawyer having knowledge that another lawyer has violated the rules in a manner that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority. While the rules require lawyers to be candid with investigators from the Bar Association, Rules Governing Disciplinary Proceedings, 5 O.S. 2001, ch. 1, app. 1–A, Rule 5.2, the rules do not require them to report their own violations. Therefore, the applicant is not subject to the requirements of Rule 8.1.

¶ 3 This Court has repeatedly held that the purpose of attorney discipline proceedings is not to punish the attorney, but to protect the public and courts. *State ex rel. Oklahoma Bar Ass'n v. Samara,* 1984 OK 32, ¶, 683 P.2d 979, 983; *State ex rel. Oklahoma Bar Ass'n v. Peveto,* 1980 OK 182, ¶ 20, 620 P.2d 392, 395. The applicant resigned from the bar, did not reapply until after five years, and candidly disclosed the circumstances leading up to his resignation before the Professional Responsibility Tribunal. That tribunal recommended reinstatement.

¶ 4 The applicant acted in a self-correcting manner by taking the actions he did. He could have agreed to reimburse the clients and the firm and then left quietly. His decision not to reapply for reinstatement prior to the lapse of five years from the effective date of resignation is the same result as that required by Rule 8.1 of the Rules Governing Disciplinary Proceedings. The only difference between the actions taken by the applicant and a resignation pending an investigation is a published order revealing the accusations against him. If this Court believes that the applicant's action in taking his firm's and clients' funds require that he not be reinstated, then that should be the issue before the Court, not the form of the resignation.

¶ 5 After considering the facts before the Court concerning applicant's breach of professional ethics, his reimbursing his firm and clients for the funds he had taken, and the mitigating facts regarding overcoming his addictive behavior, I would reinstate the applicant.

¶ 6 Moreover, I conclude from the record that the Bar Association handled the resignation and readmission appropriately under these circumstances. The actions taken by the Bar Association regarding the resignation are irrelevant to whether or not the applicant should be reinstated.