2007 OK 82

**In the Matter of the REINSTATEMENT Of Jerry E. OTIS to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.**

**SCBD No. 5281.**

Supreme Court of Oklahoma.

Oct. 30, 2007.

Stanley M. Ward, Woodrow K. Glass, Scott F. Brockman, Norman, Oklahoma, for Petitioner.

Janna Dunagan Hall, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Respondent.

*OPINION*

WATT, Justice.

¶ 1 Petitioner Jerry E. Otis voluntarily submitted his resignation from membership to the Oklahoma Bar Association (the Bar) pending disciplinary proceedings on November 23, 1993. This Court found Otis had complied with the provisions of Rule 8.1, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S.1991, Ch. 1, App. 1–A[1] and

---

1. Rule 8.1, RGDP, currently cited at 5 O.S.2001, Ch. 1, App. 1–A, has not changed since Otis resigned. It provides:

A lawyer who is the subject of an investigation into, or a pending proceeding involving, allegations of misconduct may resign membership in the Oklahoma Bar Association, and thereby relinquish the right to practice law, only by delivering to the Commission an affidavit stating that the lawyer desires to resign and that:

approved the resignation in an order filed on January 11, 1994. On March 13, 2007, Otis filed his Petition for Reinstatement pursuant to Rule 11, RGDP, 5 O.S. Supp.2002, Ch. 1, App. 1–A. Following a hearing before the Trial Panel of the Professional Responsibility Tribunal (PRT) on Otis' reinstatement, the Trial Panel issued its report. It determined Otis had failed to carry his burden of showing by clear and convincing evidence that he is entitled to reinstatement and recommended denial of his petition.

## FACTS

¶ 2 Otis was admitted to the Oklahoma Bar Association on July 26, 1966. He practiced law in Antlers, Oklahoma, until August 1, 1993. Otis was appointed Conservator of the Mary L. Cothran Conservatorship on May 26, 1981. Over the course of approximately 10 years, Otis used funds from the conservatorship estate to pay his personal debts. Mary died on May 3, 1995. On or about August 30, 1996, Otis entered a plea of *nolo contendere*, with a plea agreement in the district court, to the charge of Embezzlement by Trustee, 21 O.S.1991 § 1454. He received a five-year deferred sentence and was ordered to pay restitution for the benefit of Cothran's heirs through the Johnston County District Attorney Restitution Fund. He made a payment of $33,062.13 [2] as directed and also paid to the Cothran heirs the sum of $6,937.87, representing the value of his partnership interest in the law firm from which he resigned. He successfully completed his deferred sentence in August, 2001, and the charges were expunged.

¶ 3 An audit [3] performed at the request of Mary L. Cothran's (Mary) heirs concluded that the amount of $174,576.00 was converted by Otis. Mary's heirs, Mary Jo Thompson and Tom Cothran, her niece and nephew, filed a claim in that amount against Otis with the Oklahoma Bar Association's Client Security Fund.[4] Dan Murdock, General Counsel for the Bar, notified Otis of the claim by letter. Murdock reported that the Board of Governors had met and decided to accept the Client Security Fund Committee's recommendation that the claim be paid in the

(a) The resignation is freely and voluntarily rendered, the lawyer is not being subjected to coercion or duress, and the lawyer is fully aware of the consequences of submitting the resignation;

(b) The lawyer is aware that there is presently pending an investigation into, or proceedings involving, allegations that there exist grounds for discipline, specifying particularly the misconduct alleged;

(c) The lawyer agrees that he may be reinstated only upon full compliance with the conditions and procedures prescribed by these Rules, and no application for reinstatement may be filed prior to the lapse of five years from the effective date of the resignation.

2. Otis testified that his father paid the $33,062.13 on his behalf.

3. At the request of Tom Cothran and Mary Jo Thompson, the CPA firm of Cross & Robinson of Tulsa, Oklahoma, created an "Accountants' Report" on November 11, 1994. The report addressed to Tom Cothran provides:

At your request, we have applied the agreed-upon procedures described in Schedule A to the accounting records and financial documents of Mary L. Cothran for the period beginning January 1, 1982 and ended December 31, 1992. It is understood that this report is solely for your information and is not to be referred to for any purpose or distributed to anyone who did not participate in determining the procedures without our consent. Our procedures and findings are described in Schedule A of this report.

Because the procedures described in Schedule A do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the accounting records or financial documents referred to above. In connection with the procedures we applied, no matters came to our attention that caused us to believe that the records or documents specified in Schedule A should be adjusted other than those adjustments described in Schedule A. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you. This report relates only to the records and documents specified in Schedule A and does not extend to any financial statements of Mary L. Cothran taken as a whole.

4. Otis testified he did not receive a day in court to respond to the claim against the Client Security Fund. He stated he did not get "a full-blown due process type thing. . . ." However, the record shows Otis responded in writing on July 29, 1997, to the claim against him. He asserted, *inter alia*, as a defense to the claim brought by Mary Jo Thompson that she was not his client and therefore lacked capacity and standing to bring the claim.

amount of $133,076.00. Murdock explained, however, that because the number of claims approved by the Committee exceeded the available funds, the Board of Governors recommended paying the claim in the "pro-rated amount of $45,066.24." The letter also provided, "Should you apply for reinstatement to the Oklahoma Bar Association at any time in the future, you will be responsible for repayment of this amount." Otis repaid the Client Security Fund the amount of $45,066.24 [5] prior to filing his Petition for Reinstatement. He received a Chapter 7 discharge in bankruptcy in April, 1996.

¶ 4 Otis testified that after his resignation he first worked as a real estate agent for a short time. From February, 1995 until June, 2000, he was employed by a non-profit organization in Hugo, Oklahoma, Little Dixie Community Action Agency. The agency provided housing assistance to low income persons. He testified he disclosed his past to his employer. Following that employment, he worked for Goodland Presbyterian Children's Home, a place for long-term care for troubled boys, ages six through twelve. Otis served as Goodland's Assistant Director for Development, in a fundraising capacity until October 1, 2006. He testified that if his reinstatement petition is granted, he intends to do pro bono work for Legal Aid for lower income clients. He also testified that he will not put himself in the position again of being tempted with the money of other people. He has essentially retired and wants to restore his reputation as a lawyer.

## TRIAL PANEL REPORT

¶ 5 The Trial Panel found Otis had presented evidence showing compliance with two of the three requirements of Rule 11.5, RGDP, 5 O.S.2001, Ch. 1, App. 1–A.[6] It found the evidence showed he had not engaged in any unauthorized practice of law during the period of his resignation as required by Rule 11.5(b) and that he possesses the competency and learning in the law required for admission to the Bar pursuant to Rule 11.5(c). However, the Trial Panel did not find that Otis possesses the good moral character entitling him to admission to the Bar. See Rule 11.5(a). Although the Panel noted his witnesses testified as to his present moral fitness, his consciousness of the wrongfulness of his acts and the disrepute which his conduct had brought to the profession, the Trial Panel noted his misconduct was of a serious nature and had continued for ten years. The Panel focused its attention on the question of restitution, stating:

> Of great concern to the trial panel is the question of restitution. Admittedly Petitioner paid the sum of restitution of $33,272.13 [7] as required in the Order deferring sentence in the felony case against him. And Petitioner repaid the Client's Security Fund the sum of $45,066.24 which is required as a condition precedent to reinstatement by RGDP Rule 11.1(b). In addition, Petitioner paid $6,937.87 to the victims. Restitution paid totals $85,276.24.

> Nonetheless, the OBA Board of Governor's (sic) determined and notified Petitioner Otis in January of 1998 that the victims (sic) claim was approved in the amount of $133,076.00. As stated, Petitioner has paid only $45,066.42 [8] (sic) of the

5. He remarried on March 16, 2002, to his present wife, Kay. Before their marriage, Kay offered to repay the funds owed to the Clients Security Fund on his behalf. Although he initially declined, he eventually accepted her offer.

6. Rule 11.5, RGDP, provides:
At the conclusion of the hearing held on the petition for reinstatement, the Trial Panel of the Professional Responsibility Tribunal shall file a report with the Supreme Court, together with the transcript of the hearing. Said report shall contain specific findings upon each of the following:
(a) Whether or not the applicant possesses the good moral character which would entitle him to be admitted to the Oklahoma Bar Association;
(b) Whether or not the applicant has engaged in any unauthorized practice of law during the period of suspension, disbarment or resignation;
(c) Whether or not the applicant possesses the competency and learning in the law for admission to practice law in the State of Oklahoma....

7. This amount includes costs assessed in his criminal case in the amount of $210.00.

8. The correct amount is $45,066.24.

approved claim. The balance of the approved claim, recognizing the victims' monetary loss, is $88,009.38, which remains unpaid.

¶ 6 Although the Trial Panel found Otis repaid the Client Security Fund $45,066.24 as directed, and as required by Rule 11.1, RGDP,[9] it also found he had failed to show by clear and convincing evidence that he was entitled to reinstatement and recommended denial of his petition.

## STANDARD OF REVIEW AND BURDEN OF PROOF

¶ 7 This Court considers a petition for reinstatement by a *de novo* standard of review. *Matter of Reinstatement of Massey*, 2006 OK 21, 136 P.3d 610; *Matter of Reinstatement of Blevins*, 2002 OK 78, 59 P.3d 510. When a lawyer has resigned from the Bar pending disciplinary proceedings, as in this case, he has the same burden as an individual who has been disbarred by this Court and must present stronger proof of qualifications than one seeking admission to the Bar for the first time. *Matter of Reinstatement of Massey*, 2006 OK 21, ¶ 12, 136 P.3d 610, 614, citing *Matter of Reinstatement of Blevins*, 2002 OK 78 at ¶¶ 3–4, 59 P.3d at 511 and Rule 11.4, RGDP.[10]

¶ 8 Additionally, there are eight factors which this Court considers in determining fitness for reinstatement. They are: (1) applicant's present moral fitness, (2) demonstrated consciousness of the conduct's wrongfulness and the disrepute it has brought upon the legal profession, (3) the extent of rehabilitation, (4) the original misconduct's serious-ness, (5) conduct after resignation, (6) time elapsed since the resignation, (7) applicant's character, maturity and experience when he resigned, and (8) present legal competence. *Matter of Reinstatement of Blevins*, 2002 OK 78, ¶ 4, 59 P.3d 510, 511; *Matter of Reinstatement of Kamins*, 1988 OK 32, 752 P.2d 1125.

¶ 9 In *Matter of Reinstatement of Smith*, 1994 OK 19, 871 P.2d 426, we considered a petition for reinstatement of a former lawyer who was convicted of felonies. In discussing our focus in such matters, we said:

> While we have permitted attorneys to be reinstated after convictions of crimes, we do not agree to reinstatement without a thorough and critical review of the crimes committed and their effect on the legal profession. 'To this end the evidence must support a finding that the Applicant would not commit any serious crime if readmitted. Foremost consideration must be given to protecting the public welfare. Finally, there must be a determination that reinstatement would not adversely effect the Bar. *Matter of Reinstatement of Cantrell*, 785 P.2d 312, 313 (Okla.1989).' It remains the duty of this Court to safeguard the interests of the public, the courts and the legal profession. *Kamins*, 752 P.2d at 1130.

*Matter of Reinstatement of Smith*, 1994 OK 19, 871 P.2d 426, 428 (footnote and citations omitted).

## CONTENTIONS

¶ 10 Otis contends he has fully reimbursed Mary's heirs for the funds he embezzled

---

9. Rule 11.1, RGDP, provides, in part:

   A person whose name has been stricken from the Roll of Attorneys for non-payment of dues, or who has been suspended from the practice of law for a period of longer than two (2) years or disbarred, or who has resigned membership in the Association, may be readmitted to the practice of law only through the following procedures:

   . . .

   (b) If any funds of the Client's Security Fund of the Oklahoma Bar Association have been expended on behalf of the applicant, the applicant must show the amount paid and that the same has been repaid to the Oklahoma Bar Association to reimburse such Fund.

10. Rule 11.4, RGDP, provides in pertinent part:

    An applicant for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement will be required to present stronger proof of qualifications than one seeking admission for the first time. . . .

from her estate through his payments of $40,000.00 [11], costs of $210.00 and $45,066.24, for a total of $85,276.24. This Court has examined the evidence of Otis's disbursements from the Cothran conservatorship estate. Undoubtedly, the payments Otis made to himself and the payment of his personal taxes to the Internal Revenue Service (IRS) and the Oklahoma Tax Commission (OTC) directly from the conservatorship funds were flagrant and unauthorized disbursements. Tom and Mary Jo also contended that the payments to L.P. ("Pate") Cothran, Mary's brother, were unauthorized [12] and included them in their claim to the OBA Board of Governors and the Client Security Fund. Otis explained that he made those disbursements because Mary had routinely given Pate money, and it was a practice he decided to continue. Otis testified that none of the money he gave Pate was later diverted to his own personal bank account and that he did not receive any personal benefit from those payments. The Bar presented no evidence to the contrary.

¶ 11 The Bar contends reinstatement should be denied. It contends Otis has failed to show by clear and convincing evidence that he had a demonstrated consciousness of the wrongfulness of his conduct and the disrepute it brought upon the legal profession, citing his testimony that he did not believe Mary was harmed by his misconduct because of her mental incapacity at the time.[13] The Bar also points to his testimony that although he was confronted by Tom Cothran about the status of Mary's funds in October, 1992, he failed to disclose the real facts about his embezzlement until his law partner, Michael Burrage, was made aware of the situa-

tion in June, 1993, by a third party. The Bar further contends Otis should make full restitution to Mary's heirs, but that he never attempted to account for all of the funds taken or to make full restitution to them. The Bar also contends that some of the witnesses at the hearing testified Otis had not fully disclosed his conduct to them.[14] One of the witnesses was Otis's employer at Little Dixie.

## DISCUSSION

¶ 12 This Court has held that restitution, by itself, is not a basis for imposing lenient discipline. See *State ex rel. Oklahoma Bar Association v. Raskin*, 1982 OK 39, 642 P.2d 262, in which the lawyer was disbarred, despite having offered to pay full restitution to his victims.[15] As a mitigating factor in imposing discipline, giving judicial consideration to restitution creates the impression "that sanctions are proportioned in accordance with one's ability to pay, rather than gauged against the seriousness of one's misconduct. According significance to restitution leads to an obvious and substantial possibility of unjust discrimination. The mere circumstance of restitution is likely to be fortuitous and to depend upon conditions and circumstances that afford no reliable test of a person's moral fitness as a lawyer." *Raskin*, 1982 OK 39, 642 P.2d 262, 267.

¶ 13 In the case, *Matter of Reinstatement of Massey*, supra, a case involving misappropriation, this Court denied reinstatement, despite the payment of restitution in full. Massey embezzled money from his attorney trust account. He used the money to help operate his firm and to pay salaries. The misappro-

---

11. This amount represents a payment of $33,062.13 to the Johnson County District Attorney Restitution Fund, as ordered by the district court in Otis's criminal case, and the $6,937.87 from his law firm.

12. From the audit prepared at the Heirs' request, we calculate a total of $30,474.07 was paid to Pate Cothran from 1982 to 1991.

13. See ¶ 13, infra, for more discussion on this issue.

14. Our review of the testimony of witnesses Jackson and Yandel indicate Otis informed them of his problems to a certain extent, i.e., that he had

lost his law license due to the way money was handled for an elderly woman. However, it appears Otis failed to inform them of his personal use of the money and his plea of *nolo contendere* to the crime of embezzlement by trustee.

15. We stated in *Raskin*, at page 267:

Encouraging restitution in individual cases is a worthy purpose, but the application of lenient discipline needed to achieve it conflicts with the paramount goal of preserving public confidence in the entire bar.

priation was widespread and affected multiple clients and instances of misconduct. Massey testified at his PRT hearing that he paid his own salary out of other cases he was working on rather than the embezzled funds, thus implying he did not personally benefit from his misconduct. In his brief filed later, however, he recognized the personal benefit from the standpoint that he was able to keep his office open and pay salaries, including his own. This Court did not have a "firm conviction or belief" that if readmitted, he would not commit similar misconduct.

¶ 14 Thus, while making full restitution to a lawyer's victims will not necessarily preclude disbarment or insure reinstatement, this Court is more concerned in the instant case with Otis's position that no further restitution is necessary. At the PRT hearing, Otis was asked who was harmed by his misconduct. He acknowledged Mary's heirs suffered because the money he took would have gone to them. He also included the Bar, his fellow lawyers, his family and himself as those who suffered by his misconduct. However, he also testified Mary never suffered because she lived in a nursing home and "she always was provided for." He acknowledged she was incapacitated and suffering from dementia at the time he disclosed his misconduct to her family. He thus implied Mary was not harmed because she was unable to comprehend his breach of her trust. He acknowledged Mary's family was frustrated knowing their aunt's money was being taken without her knowledge. Regardless of whether Mary's immediate needs were being met, which we assume was the case, and regardless of whether **she knew** her immediate needs were being met, Mary was harmed by Otis because her trust in him was abused. A person in need of assistance with financial matters entrusts his or her livelihood to a Conservator, knowing that there may be a time in the future when the Conservator alone will have to make decisions because of the Ward's incapacity. This is precisely when a Conservator is needed the most. The trust Mary gave to Otis was not returned to her when it mattered most. He essentially used Mary's funds as his own for almost ten years.

¶ 15 Otis also testified that he does not believe he owes any more money as restitution because he only embezzled approximately $75,000.00, and $85,000.00 was repaid. He testified he had made no attempt since the final accounting to determine what he owes Mary's heirs, how much was paid to himself or how much he paid to the taxing authorities on his own behalf. He further testified he did not pay himself a fee as Conservator of Mary's funds and that he believed his final accounting prepared for the court was truthful. However, we note that on the final accounting, the payments to himself for the years of 1982, 1983, 1984, and 1986, have the notation "Cons.Fee" next to his name, and in 1985, there is an expenditure with the notation "(fee—Jan-Aug)" following his name.

¶ 16 Otis testified that no funds which he paid to Pate, Mary's brother, were kicked back to himself for his personal use. Apparently, he believes the checks made to Pate should not be included in the total sum of his misappropriation because he did not use those funds. However, this Court has defined three levels of culpability when evaluating the mishandling of funds in attorney disciplinary proceedings. They are:

> 1) commingling; 2) simple conversion; and 3) misappropriation, i.e., theft by conversion or otherwise. Commingling occurs when a client or third person's monies are combined with the attorney's personal funds. *See State ex rel. Oklahoma Bar Ass'n v. Taylor,* 2000 OK 35, 4 P.3d 1242. Complete separation of the money is required to insure proper accounting. *See State ex rel. Oklahoma Bar Ass'n v. Cummings,* 1993 OK 127, 863 P.2d 1164, *State ex rel. Oklahoma Bar Ass'n v. Johnston,* 1993 OK 91, 863 P.2d 1136. **Simple conversion** occurs when an attorney applies a client or third person's money to a purpose other than that for which it was entrusted. Rule 1.4(b), RGDP .... [emphasis added].
>
> . . .
>
> The third, and most serious infraction, occurs when funds are misappropriated. This happens when an attorney purposefully deprives a client or third person of money by way of deceit and fraud. *See State ex rel. Oklahoma Bar Ass'n v. John-*

*ston,* 1993 OK 91, 863 P.2d 1136. For an attorney to engage in conduct involving dishonesty and deceit is professional misconduct. Rule 8.4(c), ORPC. A finding the attorney intentionally committed such an act requires imposition of the harshest discipline-disbarment. Rule 1.4(c), RGDP. *State ex rel. Oklahoma Bar Association v. Parsons,* 2002 OK 72, ¶¶ 12–14, 57 P.3d 865, 868–869.

¶ 17 While misappropriation of client funds is the most serious of money-related professional misconduct, *Matter of Reinstatement of Fraley,* 2005 OK 39, 115 P.3d 842, the above-noted definition of "simple conversion" appears to apply to the payments Otis made to Pate Cothran. Otis explained these expenditures were made because Mary had given him money over the years and he decided to continue the practice. Our calculation from the evidence presented to the Trial Panel shows Otis paid $30,474.07, a substantial sum, to Pate over the ten year period. While Otis may argue that Mary would have wanted to continue giving money to her brother, there is no evidence to show these disbursements were authorized. Thus, these payments constitute "simple conversion," as defined by Oklahoma law.

¶ 18 The Bar's Application to Assess Costs against Otis pursuant to Rule 11.1(c) is granted. The Bar is entitled to be reimbursed in the amount of $1309.75.

## CONCLUSION

¶ 19 For reinstatement to be warranted, we must have a firm conviction that the petitioner would not engage in similar misconduct, i.e., the evidence must be clear and convincing. *Matter of Reinstatement of Massey,* 2006 OK 21, ¶ 16, 136 P.3d 610, 615, citing *Matter of Reinstatement of Hird,* 2001 OK 28, 21 P.3d 1043. While we appreciate and believe Otis's expressions of remorse and we acknowledge that his witnesses believe in him, we do not find he has presented clear and convincing proof of stronger qualifications than one seeking admission for the first time. Although Otis repaid the amounts he was ordered to pay, we agree with the Trial Panel that he has not paid all that he owes. More troublesome, however, is Otis's position

that he owes nothing further because there has been no official adjudication that a certain amount is due. We therefore hold that Otis has not met his burden of clear and convincing evidence in favor of reinstatement and his petition is denied. Otis is further ordered to pay costs in the amount of $1309.75 within thirty days of the date of this opinion.

**REINSTATEMENT IS DENIED; PETITIONER IS ORDERED TO PAY COSTS.**

WINCHESTER, C.J., EDMONDSON, V.C.J., HARGRAVE, KAUGER, WATT, TAYLOR and COLBERT, JJ., concur.

OPALA, J., not participating.