2009 OK 1

In the MATTER OF the REINSTATE-MENT OF Waldo E. JONES, II, OBA #4813 to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.

SCBD No. 5340.

Supreme Court of Oklahoma.

Jan. 13, 2009.

Deborah Reheard, Carol Isk, Eufaula, for applicant.

Janis Hubbard, First Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for respondent.

**EDMONDSON, C.J.**

¶1 Petitioner, Waldo E. Jones, II, was admitted to the Oklahoma Bar Association in 1966. In 1998, he submitted his resignation pending disciplinary proceedings to this Court after it was discovered that he had taken money from a guardianship account for his own use. We approved his resignation and his name was stricken from the Roll of Attorneys by order of this Court on February 17, 1998, in *State of Oklahoma ex rel. Oklahoma Bar Ass'n. v. Jones,* 1997 OK 159, 952 P.2d 525.

¶2 This is petitioner's first attempt at reinstatement. He filed this petition on October 22, 2007, pursuant to Rule 11.1 of the Rules Governing Disciplinary Proceedings, (RGDP), 5 O.S.2001, Ch. 1, App. 1–A, and hearing on his application was had before a three-member Trial Panel of the Professional Responsibility Tribunal, which concluded that Mr. Jones had presented sufficient evidence in support of his application to meet his burden of proof and that he had satisfied all requirements for reinstatement. The panel unanimously recommended his petition should be granted and that Mr. Jones should be reinstated to the practice of law without the necessity of taking the bar examination. The Oklahoma Bar Association did not present any witnesses against Mr. Jones, but it contends that his evidence did not support his burden of proof and prays that we deny his application.

I.

¶3 Recommendations of the Trial Panel, while entitled to great weight, are merely advisory. *Matter of Reinstatement of Kamins,* 1988 OK 32, 752 P.2d 1125, 1129. This Court does not sit in review of the trial

panel's recommendations; instead, we exercise our original and exclusive jurisdiction through *de novo* examination of the evidence. *Matter of Reinstatement of Page*, 2004 OK 49, 94 P.3d 80, 81. It is therefore our first responsibility to ensure that the record before us is complete and sufficient for our thorough inquiry into all relevant facts pertaining to the applicant, the original misconduct and the likelihood of applicant's rehabilitation to determine whether he has carried his burden of showing clearly and convincingly that he is worthy of being an attorney of the State of Oklahoma. *State ex rel. Oklahoma Bar Ass'n v. Samara*, 683 P.2d 979, 983–984. We find that the record before us is sufficient to allow our independent determination of all essential facts.

■ ¶ 4 An applicant seeking reinstatement to the practice of law bears a heavy burden which is the same whether he or she was disbarred or resigned from the bar pending disciplinary proceedings. Reinstatement is not automatic. Even where the evidence is undisputed that the applicant has engaged only in proper conduct during suspension, the applicant must affirmatively establish that his or her conduct will conform to the high standards required of a member of the Bar if reinstatement is granted. *Matter of Reinstatement of Hanlon*, 1993 OK 159, 865 P.2d 1228.

■■ ¶ 5 The more severe the offense the heavier the burden the applicant must overcome to gain reinstatement; but each application for reinstatement to the Bar Association must be considered on its own merits, and will fail or succeed on the evidence presented and the particular circumstances of that individual's case. *Matter of Reinstatement of Hardin*, 1996 OK 115, 927 P.2d 545, 546. Rule 11.4 RGDP sets forth the following standard of proof an applicant must meet:

An applicant for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement will be required to present stronger proof of qualifications than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applicable, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel on an application for reinstatement.

¶ 6 Rule 11.5 RGDP requires that prerequisite to reinstatement, the trial panel must make specific findings to this Court as to whether the applicant: (1) possesses the good moral character entitling him or her to be admitted to the Oklahoma Bar Association; (2) has engaged in any unauthorized practice of law during the period of suspension, disbarment or resignation; and (3) possesses the competency and learning in the law required for admission to practice law in Oklahoma.

■ ¶ 7 It is our primary duty to protect the interest of the public, the judiciary and the legal profession. We therefore take our responsibility of passing on applications seeking reinstatement to the practice of law of one who has previously failed to meet the profession's standards with utmost seriousness. To that end we have determined that we must also consider the following factors in our evaluation of the evidence: (1) the present moral fitness of the applicant; (2) the applicant's demonstrated consciousness of wrongful conduct and the disrepute which that conduct brought to the profession; (3) the extent of the applicant's rehabilitation; (4) the seriousness of the original misconduct; (5) the applicant's conduct after the resignation; (6) the time which has elapsed since the resignation or discipline; (7) the applicant's character, maturity and experience at the time of discipline or resignation; and (8) the applicant's present competence in legal skills. *Matter of Reinstatement of Kamins*, 1988 OK 32, 752 P.2d 1125, 1130.

## II.

¶ 8 The Bar Association and Petitioner entered into joint stipulations of fact and submitted joint exhibits to the trial panel in support of a full and complete record. These reveal the following pertinent facts regarding the incident which led to his resignation: after it was discovered that funds were missing from the guardianship, a lawsuit was brought by the successor guardian for a claim of $47,313.14, and stipulations by parties to that action reflected that funds in the amount of $37,000 did not go to benefit the ward, but were knowingly received by Petitioner or used for his benefit; the surety on the bond for the guardian paid $35,674.44 to the successor guardian; judgment was entered against Petitioner and his father,[1] and those judgments were satisfied upon the probate of Petitioner's father's estate with the sale of property that was to have been inherited by Petitioner.

¶ 9 It was further agreed that Petitioner was in compliance with both federal and state tax requirements; that he has federal taxes owing for the years 1993–2004 in the approximate amount of $84,000, for which he has entered into an agreed payment plan with the Internal Revenue Service for monthly payments in the amount of $704.00 to satisfy his tax indebtedness, with interest and penalties; and that he is participating in an agreed payment plan with the Oklahoma Tax Commission for taxes, interest and penalties for the years 1991–2004 in the amount of approximately $22,000 wherein he pays $219.00 a month for 12 months subject to possible upward revision thereafter.

¶ 10 The parties also agreed that Petitioner received previous discipline of a private reprimand in 1997 for his neglect in missing a statute of limitations in a client's claim; that no additional disciplinary matters were pending at the time of Petitioner's resignation; that the client security fund had not expended any funds on behalf of Petitioner; and that Petitioner has complied with all

Oklahoma Bar Association dues and Mandatory Continuing Legal Education requirements since his resignation, and if reinstated he would need only to fulfill the requirements for the year of reinstatement.

¶ 11 The Bar Association agreed that in its investigation it found nothing to contradict Petitioner's evidence that he does possess the good moral character required for reinstatement, and also that he has continued to keep abreast of the law and current developments since his resignation by attending 105 hours of CLE, working as a legal assistant and receiving the Bar Journal. Additionally, the Bar agreed it had found no evidence that Petitioner engaged in the unauthorized practice of law since he resigned.

¶ 12 Testimony before the Trial Panel showed that at the time of his resignation, Mr. Jones was a very well known and prominent attorney in Tulsa. His counsel pointed out that Mr. Jones's ancestry is a prominent piece of Tulsa history; he is a third-generation lawyer and his family members had been important leaders of the community for many years. For over thirty years Mr. Jones carried out that family tradition. He was a well-respected attorney with a good practice, doing a great deal of community work and serving on many boards. However, his personal life was crumbling around him because of financial problems; and, in his own words, his character flaws of greed, selfishness, arrogance, pride and self-centeredness led him to become a common thief. Mr. Jones had been in practice with his father since passing the bar; but by the time of the events in question, his father had retired and was in a nursing home. Petitioner had been having financial problems for some time. He had serious tax indebtedness, tax liens had been placed on his property and collection procedures were being brought against him. He had borrowed money to pay these debts, but he had fallen behind again and knew he was in a desperate situation. In 1992, a client came to him to discuss a proposition he had received from a bank in Nigeria promising

---

1. In greater detail, that journal entry reflects that by agreement of the parties, joint and several judgments were entered in favor of surety against Petitioner in the amount of $35,000 and against the estate of Petitioner's father in the amount of $35,674,44. Judgments in favor of successor guardian were entered against the estate of Petitioner's father in the amount of $11,638.70 and against Petitioner in the amount of $2000.

$28 million for assistance in setting up a corporation in Nigeria.

¶ 13 Petitioner did not realize this was a scam. Instead, he saw it as an opportunity to get money that would solve his financial problems. So, when the Nigerians explained that he first must send money to them as a show of good faith before they could send him millions of dollars, he wrongfully took funds from the guardianship account, planning to pay it back when the money from Nigeria was sent to him. His father was the ward's long-time guardian and Petitioner had been serving as custodian-in-fact, due to his father's incapacity. Petitioner testified he took his father to the bank and had him withdraw the ward's money which petitioner then used for his own benefit. The promised money from Nigeria never arrived.

¶ 14 Petitioner testified that he and his wife faced many adversities during the years following his resignation. They had very little income. He worked for a long period as a legal assistant for attorney Wilma Palmer, who is now a judge, and he and his wife also received some funds from a teaching ministry which they began, and continue to operate, to help others overcome similar character problems. They were homeless for a considerable time as their house had been sold by agreement to satisfy the judgments. When questioned as to whether any outstanding balance remained after the proceeds of the sale were paid on the judgments, Petitioner testified there had been no attempt to collect on a balance nor had a judgment been renewed. Ultimately, Petitioner and his wife lost everything. He explained that while many painful things happened during that time, it was nevertheless a period of tremendous personal growth and learning for him about life and about his own character and integrity. Petitioner expressed desire and intention to work with Lawyers Helping Lawyers to help others who are in trouble due to character problems. He believes that in doing so he will be able to add to the legal community as well as to the lives of the individuals.

¶ 15 Petitioner recounted that when he got in trouble it was the first time he recognized that he had major flaws in his character. He realized then he needed to change himself and his life and he began to work hard to make those changes. He offered no defense or excuse for his actions. Petitioner believes he has rehabilitated himself and that he is not the same person he was ten years ago. He explained that he waited so long after the five-year period to file for reinstatement because did not think he was ready before. He believes he is now a different and a better person, having developed his character and integrity so that he has the ability to deal with adversity and face problems without blaming others. In light of his personal growth, together with the control over his tax liability he has achieved through the payment plan, petitioner now considers himself worthy to make this request for reinstatement to the profession.

¶ 16 Petitioner is remorseful about his actions. He acknowledges the disrepute his misconduct brought on the legal profession and the hurt and sorrow he caused others including his own family and friends.

¶ 17 The Professional Responsibility Tribunal received nine letters in support of Petitioner's application, attesting generally to his moral and ethical fitness, his remorse for his misconduct and acceptance of responsibility for his actions. Three of those writers, Wilma Palmer, Special District Judge of Tulsa County, and two attorneys, William Dodson, Jr., and Jim Frasier, also testified in person before the panel in support of Petitioner's application, stating they had known him for many years and were aware of his resignation and the cause. They believed Petitioner had learned from his misconduct, that he has been humbled and embarrassed by it; also that he takes responsibility for his actions and their consequences and is very remorseful. They believed that through his hard work and difficulties he has indeed become a better person who would not make such mistakes again; that he is morally fit to practice law and that if readmitted, he would be an asset to the profession. They testified Petitioner has kept abreast of the law and his legal skills are current and satisfactory. Both attorneys stated they would not hesitate to have Petitioner working in their offices. Mr. Dodson testified he had seen Peti-

tioner tell a person who asked Petitioner for legal advice that he was no longer a lawyer and could not give legal advice, that he had resigned from the practice of law because he had committed a wrongful act.

¶ 18 Mr. Dodson also testified that he had represented Petitioner in regard to the judgments entered against the family home that was to have been petitioner's inheritance. He explained that the house was sold by agreement in order to pay the judgments securing the debts from the proceeds; the proceeding was not one in foreclosure. Mr. Dodson stated that to the best of his knowledge those judgments were entirely satisfied by the proceeds, and that he had never received notice of the existence of any unpaid balance.

¶ 19 Additionally, the CPA who worked with Petitioner to straighten out the latter's tax problems testified before the panel, stating he believed Petitioner to be an honest person with a good heart and who has learned from his mistakes. He stated he would have no problem in requesting legal assistance from Petitioner and would refer others to him.

### III.

¶ 20 We are concerned about Petitioner's original misconduct, and it is beyond question that his transgression was one of great seriousness. We do not agree with the Bar that this one factor outweighs the cumulative factors weighing in support of his reinstatement. To the contrary, as found by the Trial Panel, Petitioner's evidence clearly and convincingly shows that he has carried his heavy burden of proof; he has met the prerequisites for reinstatement and affirmatively shown that his future conduct will conform to the high standards required of a member of the Bar.

¶ 21 Neither are we persuaded by the Bar's additional contention that Petitioner's application "has not demonstrated stronger proof of qualifications than one seeking admission to the bar for the first time." As previously set forth in this opinion, Petitioner has submitted a great deal of evidence concerning his qualifications for reinstatement. This evidence is stronger proof of qualifications than is required from a first-time applicant from whom the rules require that he or she "shall have good moral character, due respect for the law, and fitness to practice law," but demand no proof of same. Rules Governing Admission to the Practice of Law, 5 O.S.2001, Ch. 1, App. 5, Rule 1, Section 1.

¶ 22 Under the particular facts and circumstances of this case, we agree with the recommendation of the Professional Responsibility Tribunal that Petitioner has satisfied all requirements for reinstatement and his petition should be granted.

¶ 23 Therefore, the petition of Waldo E. Jones, II, for reinstatement to membership in the Oklahoma Bar Association and to the Roll of Attorneys is GRANTED and Petitioner is reinstated to the practice of law in Oklahoma. Costs in the amount of $908.32 are to be paid by Petitioner within ninety days from the date this opinion becomes final.

¶ 24 EDMONDSON, C.J., HARGRAVE, KAUGER, WATT, REIF, JJ.-Concur.

¶ 25 TAYLOR, V.C.J., WINCHESTER, J.-Dissent.

¶ 26 OPALA, J.-Disqualified.

¶ 27 COLBERT, J.-Not Voting.

TAYLOR, V.C.J., with whom WINCHESTER, J. joins, dissenting.

¶ 1 Waldo E. Jones II, is seeking reinstatement to the practice of law after victimizing two people. The first victim was Jones' own incapacitated father whom Jones got to withdraw money from a ward's accounts for Jones' benefit.[1] The second victim was the incapacitated ward, Mr. Flake, whose money Jones took for his own benefit. Jones has been less than honest and candid with the Professional Responsibility Tribunal (PRT) and with this Court and, after bringing disre-

---

**1.** The ability to have his father commit the actual withdrawal of Mr. Flake's funds may account for Jones' unexplained failure to have his father removed as guardian when his father became incapacitated.

pute on his family's name, has exploited it for his own benefit. While acknowledging that sympathy should not play a part in our decision to reinstate, *see* Rules Governing Discipline Proceedings (RGDP), 5 O.S.2001, ch. 1, app. 1–A, rule 11.4; *State ex rel. Okla. Bar Ass'n v. Hird*, 2008 OK 25, ¶ 11, 184 P.3d 535, 540, he has played on the PRT's and this Court's sympathies. Because the evidence is that Jones continues his chicanery so that his reinstatement will compromise this Court's duty to protect the public, I respectfully dissent.

## I. EVIDENTIARY BURDEN ON A NEW APPLICANT

¶ 2 Before addressing the evidence, I feel compelled to address what I consider to be an incorrect statement in the Court's opinion. At paragraph 21 of the opinion, the Court states that a first-time applicant must provide no proof of "good moral character, due respect for the law, and fitness to practice law." An understanding of the application process is necessary to understand the fallacy of this statement.

¶ 3 Title 5, section 12 of the Oklahoma Statutes grants this Court the "exclusive power and authority to pass upon qualifications and fitness of all applicants for admission to practice law in the State of Oklahoma." 5 O.S.Supp.2003, § 12. A person seeking first-time admission to the practice of law in Oklahoma, by exam or on motion, must file a verified application with the Oklahoma Bar Association (OBA). Rules Governing Admission to the Practice of Law (RGAPL), 5 O.S.2001, ch. 1, app. 5, rules 2, § 2 and 4, § 2; Oklahoma Board of Bar Examiners (Board), http://www.okbbe.com/applications.aspx (last visited Jan. 6, 2009). In addition to submitting a college graduation certificate and a recent photo, a student seeking to take the bar exam must submit two sets of fingerprints and a Request for Preparation of a Character Report (Character Report Request)[2] from the National Conference of Bar Examiners. Rule 4, § 2(b)-(d), RGAPL. A national criminal history record check is required for all applicants. 5 O.S.Supp.2003, § 12; 74 O.S.2001, § 150.9; *see* Rule 4, § (2)(b), RGAPL.

¶ 4 The applications for admission upon examination and upon motion and the preamble to the RGAPL informs the applicant of the duty of candor. They provide:

Each applicant for admission to the bar has a duty to be candid and make full, careful and accurate responses and disclosures in all phases of the application and admission process. Each applicant must respond fully to all inquiries. It is not proper for an applicant to give either a highly selective or sketchy description of past events reflecting on the applicant's qualifications for admission to the bar. . . .

Preamble, RGAPL; Board, http://www.okbbe.com/applications.aspx. They warn: **"An applicant who violates this duty may be denied admission to the bar."** Preamble, RGAPL; Board, http://www.okbbe.com/applications.aspx (emphasis added).

¶ 5 An applicant for first time admission to the OBA is required to answer the following questions on the Character Report Request.

10. A. Have you ever been disbarred, suspended, censured, or otherwise reprimanded or disqualified as an attorney?

☐ Yes    ☐ No

B. Have you ever been the subject of any charges, complaints, or grievances (formal or informal) concerning your conduct as an attorney, including any now pending?

☐ Yes    ☐ No

. . .

18. Has any surety on any bond on which you were the principal been required to pay any money on your behalf?

☐ Yes    ☐ No

. . .

19. Have you ever been a named party to any civil action?

☐ Yes    ☐ No

. . .

---

**2.** The National Board of Bar Examiners' Character Report Request can be found at http://www.ncbex.org/fileadmin/mediafiles/downloads/Character_and_Fitness/ Standard07.pdf (last visited Jan. 6, 2009).

24. A. Have you had any debts of $500 or more (including credit cards, charge accounts, and student loans) which have been more than 90 days past due within the past three years?

☐ Yes   ☐ No

. . .

¶ 6 On the Character Report Request, an applicant is also required to provide the names of six references who are not relatives and are not current or previous employers. The applicant must aver: "I have read the foregoing document and have answered all questions **fully and frankly**. The **answers are complete and true** to the best of my knowledge...." (Emphasis added.) On Form 3 of the Character Report Request, the applicant must report the information and attach the pleadings, judgments, and final orders concerning any civil actions in which the applicant was a party.

¶ 7 The Board has the power to make an independent investigation into the applicant's moral character, respect for the law, or fitness to practice law. Rules 12, 13, RGAPL. The Board publishes the applicants' names in the Oklahoma Bar Journal. *See* 79 O.B.J. 100–101 (Jan. 19, 2008). The Board requests OBA members to "examine the list and bring to the board's attention in a signed letter any information which might influence the board in considering the moral character and fitness to practice of any applicant for admission." *Id.* at 100.

¶ 8 If the Board refuses to grant approval for the applicant to take the bar examination, Rule 11, § 1, RGAPL, the applicant may request a hearing before the Board. *Id.* § 2. If the hearing results in an unfavorable decision, the applicant may appeal to this Court for review. *Id.* § 6. Throughout the proceedings, the applicant has the burden of establishing eligibility to take the examination, *i.e.*, to present evidence of good moral character, due respect for the law, and fit-

ness to practice. *Id.* § 7. If a final Board decision to deny any application is based on lack of good moral character, due respect for the law, or fitness to practice law, an applicant may not reapply for admission until the lapse of sixty months. Rule 13, RGAPL.

¶ 9 The process for first-time applicants to be admitted to the practice of law in Oklahoma requires an enormous amount of evidentiary proof that the applicant is of good moral character and is fit to practice law. Once a first-time applicant's integrity is called into question, either by the National Board of Bar Examiners' character report, by a letter from an OBA member, or in some other manner, the applicant has the duty to come forth with additional evidentiary proof of good moral character and fitness to practice law. Rule 11, § 7, RGAPL. This rigorous vetting process belies the Court's statement that no proof is demanded of a first-time applicant's "moral character, due respect for the law, and fitness to practice law." The majority opinion serves to weaken our application process that protects the public from unqualified lawyers.[3]

## II. BURDEN OF PROOF AND STANDARD OF REVIEW IN REINSTATEMENT PROCEEDINGS

¶ 10 Under Rule 11.4 of the RGDP, an applicant for reinstatement bears the burden of proof by clear and convincing evidence that the applicant's conduct will conform to the high standards of a member of the bar. An applicant seeking reinstatement **must present stronger proof of good moral character, due respect for the law, and fitness to practice law than one seeking admission for the first time.** Rule 11.4, RGDP; Rule 1, RGAPL. An applicant must present proof which will overcome this Court's former judgment that the applicant does not

---

**3.** Title 5, section 14 of the 2001 Oklahoma Statutes provides in part:

When a person applies to the Supreme Court for admission to the bar, he shall be examined by the Court, or by a commission appointed by the Court, under such rules and regulations as the Court may provide, touching his fitness and qualifications; and if, on such examina-

tion the Court is satisfied that he is of good moral character, and has a competent knowledge of the law, and sufficient general learning, an oath of office shall be administered to him, and an order shall be made on the journal that the applicant be admitted to practice as an attorney and counselor at law in all courts of record of this state....

possess the necessary qualifications to practice law. *Id.*

¶ 11 Because a resignation pending disciplinary proceedings is tantamount to disbarment, *State ex rel. Okla. Bar Ass'n v. Anton,* 2007 OK 84, ¶ 14, 175 P.3d 364, 368, an applicant seeking reinstatement who resigned pending disciplinary proceedings has the same onus as one who was disbarred by this Court's order. *In re Reinstatement of Fraley,* 2005 OK 39, ¶ 34, 115 P.3d 842, 851. The more egregious the underlying offense, the heavier the burden. *Id.* ¶ 37, 115 P.3d at 852. Waldo E. Jones II resigned pending disciplinary proceedings and continues to admit that nothing is "more serious than an attorney taking money that has been entrusted to him." Here the seriousness of Jones' offense is made more offensive by the fact that Jones exhibited a pattern of taking advantage of incapacitated victims, Jones' own father and Mr. Flake. *See id.* at ¶ 14, 175 P.3d at 368.

¶ 12 In reinstatement proceedings as in bar disciplinary proceedings, this Court exercises original jurisdiction and considers *de novo* the evidence solicited in the proceedings below. *In re Reinstatement of Hird,* 2008 OK 25 at ¶ 3, 184 P.3d at 537. This Court is not constrained by the PRT's findings and recommendations but exercises independently its original jurisdiction. *Id.* In reinstatement proceedings, this Court is not bound by the parties' stipulations but is required to canvas the record for evidence of the applicant's fitness to practice law. *State ex rel. Oklahoma Bar Ass'n v. Lile,* 2008 OK 82, ¶ 14, 194 P.3d 1275, 1278.[4]

## III. THE EVIDENCE AND JONES' LACK OF CANDOR

¶ 13 Jones has neglected his duty of candor in these proceedings by improperly giving "highly selective and sketchy descriptions of past events" and by obscuring the facts. The first fact question which Jones has obscured is whether he satisfied the judgments against him. The guardian who replaced Jones' father filed a claim of $47,313.14 against them

in the guardianship proceeding. According to the stipulations filed in the guardianship proceeding, beginning on March 11, 1994, and continuing through October 14, 1994, Jones, either himself or through his father, withdrew $47,313.14 of Mr. Flake's funds from the bank which were not used for Mr. Flake's benefit. At least $37,000.00 was knowingly received by Jones or was used for Jones' benefit. Jones agreed to these stipulations and admitted that he had taken the money.

¶ 14 The stipulations show that the surety on the bond for Jones' father paid $35,674.44 toward the claim. On September 3, 1997, the trial court entered judgment against the estate of Jones' father in the amount of $47,313.14, with $35,674.44 of the award in favor of the surety and $11,638.70 in favor of Mr. Flake's guardian. The trial court entered judgment against Jones for $35,000.00 in favor of the surety and $2,000.00 in favor of Mr. Flake's guardian.

¶ 15 The OBA stipulated that the judgments were satisfied, but no evidence was tendered which supported this stipulation and it is not supported by the evidence. Jones testified that of the $35,674.44 judgment in favor of the surety, $27,000.00 was repaid from his father's estate. However, there is no evidence presented at the hearing that any payments were made on the additional $8,674.44 taken from Mr. Flake, and there is no evidence that Jones has ever taken responsibility for any of the judgment's remaining balance or has made any payment from his own assets or income. In fact, Jones admitted in the hearing that the judgments were probably not satisfied.

¶ 16 Jones testified as follows.

Q Have all those judgments, to your knowledge, been satisfied through that sale?
A [Jones] Well, the—let's see. The attorney's fees were paid from the sale. There was still—through the insurance company, and remember now, the—insurance company trying to recoup money they had lost,

---

4. The stipulations presented to this Court are unsworn and contain the acknowledgment that "[t]he parties hereto understand that these Stipulations are not binding upon the PRT or the Supreme Court of Oklahoma."

and so all the monies were not—they recouped all their monies because the house—they got about 27,000 from the estate, once the house was sold and everything was closed, so there is still probably some outstanding judgment. I think the judgment was in 19—what year was the judge—19—

Q 97

A [Jones] 97, so everything in terms of that judgment.

Q Have those judgments been renewed or collected from you?

A [Jones] No, they haven't. They're not renewing—no, they have not.

Q The money that was taken from the probate then was—went as far as it could go; is that correct?

A [Jones] Yes, ma'am.

Q Now, after you—let me ask you this: Have there been any further proceedings filed against you to collect those judgments?

A [Jones] Oh, no, not at all.

Jones' answers in this segment of questioning illustrate his evasiveness in informing the PRT and this Court about the status of the judgment.

¶ 17 Jones testified that Mr. Flake was reimbursed through the insurance company. The evidence is that the bond company did not fully reimburse Mr. Flake but paid only $35,674.44 of the more than $47,000.00 Jones wrongfully took. Even though Jones misleadingly testified that Mr. Flake was reimbursed, the evidence shows that Mr. Flake was actually only reimbursed a part of the funds Jones had stolen from him.

¶ 18 It is clear from the evidence that the judgment has not been satisfied, yet Jones stipulated that it has been and beclouded the fact that the judgments were never satisfied.[5] I am not so eager to reinstate Jones that I am willing to ignore this Court's duty to examine the record de novo; to ignore this Court's duty to protect the public; to disregard Jones' admission and other evidence that he did not satisfy the judgments or

make restitution; and to rely on a stipulation which is not binding on this Court.

¶ 19 There are additional concerns that I have regarding Jones' lack of candor with the PRT and the lack of evidence to support reinstatement. The only reason Jones gives for not applying for reinstatement at the end of the statutorily mandated five-year waiting period is "because I wasn't—I didn't know what I wanted to do and I'm still dealing with me as a person." We know from the record that Jones was not paying his taxes during the first seven-years after his resignation. It was not until 2006 that he reached a compromise with the Internal Revenue Service (IRS) for payment of his 1994 through 2004 back taxes and not until 2008 did he reach the current payment plan with the Oklahoma Tax Commission (OTC), having failed to comply with an earlier agreement. Because of the OBA's lack of rigorous advocacy and Jones' lack of candor, the record is void of any evidence that Jones is complying with the current IRS and OTC agreements.

¶ 20 Another area of concern is Jones' testimony regarding the money that he stole from Mr. Flake and why he took the money. Jones testified that he bought into the Nigerian scam because he wanted money to deal with his taxes and that the scam came about in 1992. The record shows his current unresolved federal tax liability did not occur until 1994 and his current unresolved state tax liability did not began before 1991. His total unpaid state tax liability for years 1991 through 2004 was $7,877.00, excluding penalties and interest. Thus, in 1992 when Jones became involved in the scam, the evidence shows that he may have owed a small amount of state taxes and no federal taxes.

¶ 21 Jones testified that he needed the money he took from Mr. Flake to participate in the scam and that he sent the money to Nigeria. Although the scam began in 1992, record shows that Jones did not take money from Mr. Flake's account until March of 1994 and at least part of it was used for Jones'

---

5. It is unclear why the OBA would enter into a stipulation that the judgments had been satisfied when Jones admits that they have not.

personal expenses. The following transactions occurred.

Withdrawals from Mr. Flake's accounts

| Date | Amount and form | Disposition | |
| --- | --- | --- | --- |
| 3/11/1994 | $88.70 cash | Unknown | |
| | $585.74 cashier's check | Negotiated at American State Bank where Jones maintained an account | |
| 3/21/1994 | Certificate of deposit of approximate $41,000.00 of which $11,032.08 was deposited in Mr. Flake's savings account; $30,000.00 deposited in account opened by Jones in the name of Complete Lines, Inc. | Checks written on Complete Lines' account | |
| | | 3/21/1994 to Jones | $1,475.00 |
| | | 3/22/1994 to Jones | 200.00 |
| | | 3/22/1994 deposited in Jones' account | 400.00 |
| | | 3/23/1994 to Jones' wife | 1,500.00 |
| | | 3/24/1994 wired to 1st N. Hampshire for benefit of Joint Komputers Co. | 25,000.00 |
| | | 3/24/1994 to cash | 850.00 |
| | | 3/24/1994 six checks to OTC for benefit of Complete Lines | 89.50 |
| | | 3/25/1994 to American Cleaners | 102.90 |
| | | 3/25/1994 to illegible payee | 82.62 |
| | | 4/1/1994 to American Cleaners | 106.65 |
| | | 4/13/1994 to Sec. of State for Complete Lines' benefit | 10.00 |
| | | 4/13/1994 to OTC | 38.90 |
| | | 4/18/1994 to U.S. Postmaster | 29.00 |
| | | 5/1/1994 to U.S. Postmaster | 32.68 |
| | | 5/5/1994 unknown | 75.00 |
| | | 5/6/1994 to American Cleaners | 28.50 |
| 4/12/1994 | $5,000.00 cashier's check | to Jones' account | $2,000.00 |
| | | to James Perry guardianship | 50.00 |
| | | to Jones in cash | 951.03 |
| | | 3 money orders | 1,998.93 |
| 6/3/1994 | $5,000.00 cashier's check | cash | $5,000.00 |
| 10/14/1994 | $1,000.00 cash | Unknown | $1,000.00 |
| | $5,638.70 cashier's check | Negotiated for cash | 5,638.70 |

¶ 22 This evidence also raises the question of why Jones was taking money from Mr. Flake and depositing it into James Perry's guardianship. With the absence any evidence to the contrary, the only reasonable conclusion, especially in light of Jones' admitted misconduct, is that he misappropriated James Perry guardianship funds and was replacing it. This would allow the thievery from the Perry guardianship to remain undetected. It was Jones' burden to completely explain the circumstances of these transactions. Once again Jones' lack of candor and the OBA's failure to vigorously litigate this reinstatement proceeding leaves the question unanswered.

¶ 23 Although there are other concerns, the one that I mention here is that, while I am sympathetic to the homeless, Mr. Jones' testimony on this subject raises more questions than it answers. Jones testified that he and his wife were homeless and destitute during part of the time since his resignation. During this time Jones' income was between $2,600.00 and $2,900.00 a month, exclusive of any income from his wife. Then at some time, Jones started receiving additional income in the form of social security payments. It was not until 2006 and after he began receiving social security that Jones started payments on his delinquent federal taxes. Further from his testimony, Jones spent a considerable amount of money, possibly $850.00 a month, on hotels for the weekends during the time he claims to have been homeless. Jones' ample income is inconsistent with his sympathetic claim of homelessness.

## IV. APPLICATION OF JONES' BURDEN OF PROOF TO THE EVIDENCE

¶ 24 Were Jones applying for first-time admission to the practice of law, either by examination or by motion based on reciprocity, he would be required to answer candidly the questions on the OBA's application and on the Character Report Request or risk being denied admission to the bar. The truthful answers to questions 10, 18, 19, and 24 on the Character Report Request would reflect negatively on his character. In applying for first-time admission, Jones could not have successfully given the "highly selective or sketchy description of past events reflecting on his qualifications" as this Court has allowed him to do in these proceedings. Here Jones has clouded the evidence, has been evasive, and has not been honest and candid with the PRT and this Court. **I seriously doubt that this Court would allow first-time admission to the practice of law of any applicant who had stolen money from a ward, had not made restitution, and was deceitful about current and past events.** Having failed to present proof of his fitness to practice law sufficient for a first-time applicant, Jones' proof of present moral character falls far short of the proof necessary to show that he has the moral character to qualify for reinstatement.

¶ 25 The facts in *In re Reinstatement of Otis*, 2007 OK 82, 175 P.3d 357, are similar to the ones here. Otis, an applicant for reinstatement to membership in the OBA, had embezzled funds from a conservatorship to pay his personal debts. He paid court ordered restitution to the heirs of $33,062.13 and paid an additional $6,937.87. An audit concluded that Otis had converted $174,576.00 of the conservatorship funds. The OBA Client Security Fund approved a claim of $133,076.00 but, because of lack of funds, paid a pro-rated amount of $45,066.24. Otis repaid the Client Security Fund $45,066.24 before seeking reinstatement. Otis did not repay the $88,009.76 difference in the amount approved by the Client Security Fund and the amount actually paid. This Court was concerned that Otis took the position that no further restitution was necessary. Additionally, Otis implied the person for which the conservatorship was created was not harmed because she was in a nursing home, was always provided for, was incapacitated, and was suffering from dementia. This Court rejected the inference that the victim was not harmed and found that the abuse of trust was harm in itself. This Court found that it could not certify Otis' fitness to practice law and denied his petition for reinstatement.

¶ 26 Like Otis, Jones has not repaid the money that he took from one of his victims. Like Otis, Jones takes the position that no further restitution is necessary. Jones reasons that since Mr. Flake's representatives and the bonding company have allowed the judgments to lapse, they are satisfied with the payments they received. Like Otis, Jones takes the position that the victim did not suffer since his life style was unaffected and ignores that he victimized his own incapacitated father by using him to carry out the theft. It appears that the only significant difference in Otis and in Jones is that there is no indication that Otis' family was well known in the local community and had long been associated with the local practice of law, similar to the Jones' family.

## V. *IN RE REINSTATEMENT OF PATE*

¶ 27 It is clear that Jones is attempting to convince this Court that he has emulated the attorney seeking reinstatement in *In re Reinstatement of Pate*, 2008 OK 24, 184 P.3d 528, in which this Court approved the petition for reinstatement and to which I dissented. Pate had resigned pending discipline for misapplication of client funds, causing the client to be arrested; misused client funds, causing a suit against the client; neglected his duties; made misrepresentations in bankruptcy proceedings; failed to communicate with a client; charged excessive fees; and issued insufficient fund checks for personal purposes on his client trust account. At the time of his petition for reinstatement, the evidence was that Pate was a rehabilitated alcohol and drug abuser. The Court noted that Pate's family was well known in the local community and had long been associated with the local practice of law. Pate had

reimbursed the OBA's Client Security Fund the money paid out to clients for their losses.

¶ 28 There are major differences in the facts before us and those in Pate. First, it appears Pate made full restitution; Jones has not. There was evidence that Pate was rehabilitated from alcohol and drug abuse; Jones' thievery was caused by a character flaw which is not, as he argues, similar to chemical abuse. From all appearances, Pate was candid with the PRT and this Court; Jones has been elusive. In an apparent effort to present facts similar to those in *Pate*, Jones has failed to be both honest and candid in these proceedings. The similarity I find between Pate and Jones is their family reputation in the local community and in the legal community, and this similarity, in my opinion, is not relevant to these proceedings.

## VI. CONCLUSION

¶ 29 This Court has said that restitution is a consideration even though failure to make restitution does not preclude reinstatement. *In re Reinstatement of Otis*, 2007 OK 82 at ¶ 14, 175 P.3d at 363. However, in *State ex rel. Okla. Bar Ass'n v. Peveto*, 1986 OK 68, ¶ 6, 730 P.2d 505, this Court conditioned reinstatement on the payment of the judgments in civil actions by clients harmed by the applicant's misconduct. It then denied reinstatement based on Peveto's failure to satisfy the judgments. *In re Reinstatement of Peveto*, 2004 OK 95, 105 P.3d 829. Also in *In re Reinstatement of Otis*, 2007 OK 82 at ¶ 19, 175 P.3d at 363, this Court denied reinstatement based, in part, on the applicant's failure to make restitution and his attitude that he did not need to make full restitution.

¶ 30 This Court considers restitution as evidence of an applicant's "demonstrated consciousness of the wrongfulness of his conduct and his continuing growth toward financial security." *In re Reinstatement of Pate*, 2008 OK 24 at ¶ 15, 184 P.3d at 532. If Jones' victims were clients who had applied to and had been reimbursed by the Client Security Fund, Jones' failure to make restitution would be a bar to his reinstatement. Rule 11.1(b), RGDP. I submit that Jones' failure to make restitution, his attitude toward this failure and toward Mr. Flake's

losses and the impact on Mr. Flake, and his lack of candor about restitution show that he is morally unchanged since his resignation. He was unfit to practice law at the time of his resignation and is still unfit to practice law.

¶ 31 This Court strives for consistency in bar proceedings. To reconcile the present case with our other decisions, the majority opinion pronounces the overarching factor of the applicant's family reputation in the local community and the family reputation in the legal community. An attorney seeking reinstatement should not be allowed to rest on family honor but should be called to task based on the attorney's own character and acts. I submit that, without this overarching factor, this case is glaringly inconsistent with our ruling in *In re Reinstatement of Otis*, in *In re Reinstatement of Peveto*, and in *State ex rel. Okla. Bar Ass'n v. Peveto*.

¶ 32 This Court takes very seriously its duty to protect the public. *State ex rel. Okla. Bar Ass'n v. Hird*, 2008 OK 25 at ¶ 9, 184 P.3d at 539. It is the applicant's burden to satisfy this Court that its duty to the public will not be eviscerated by the applicant's reinstatement. Given the seriousness of Jones' misconduct, his failure to make restitution, Jones' lack of candor regarding restitution, and his complete failure to address issues relevant to these proceedings, I cannot certify Jones' "fitness in **unbonded fiduciary service** to his professional clientele." *See id.* ¶ 12, 184 P.3d at 540 (emphasis in original). Jones has failed to meet the heavy burden of showing that he should be reinstated to the practice of law. I ask these questions. Who is willing to trust Waldo Jones II with their assets or those of an incapacitated family member? Who is willing to place an unsuspecting public in danger of Jones' lack of moral character? I am not. To protect the public and the integrity of the legal profession, Waldo E. Jones II should not be reinstated to this honorable profession.